17-2410 RS Investments Limited, that's all, versus RSM US LLP, that's all. So would the, now there's a couple of haplies, right? So would the lawyers that are actually going to present argument all, you know, step up and identify yourselves for the record. Okay, thank you Mr. Barrett. Okay, Mr. Tarek. All right, now did you two think about, you have an alternative argument, don't you? But you join in the brief. All right, fine. Okay, so what I'm going to do here today is we are going to allow about 20 minutes per side. Is that, you know, we certainly always have more time if it's needed. So we won't cut anybody off, I promise. And then from that, Mr. Barrett, you know, you may save out some time for rebuttal. All right? I would like to do that, Your Honor. All right. Then we have one little housekeeping matter. Correct me if I'm wrong. Your Honor, I think there was a motion filed to cite additional authority? Yes, Your Honor. We filed a notice of supplemental authority. Okay. And that was to cite Henry Kinggate? A summary order, non-published? That's right, Your Honor. All right. And Mr. Barrett, you saw this motion, didn't you? Or you got an electronic copy? I did, Your Honor. I'm prepared to respond to why the decision in Kinggate shouldn't have any bearing here. All right. So is there no objection so long as you're allowed to briefly respond about this case? Yes, Your Honor. That might take the form of a written response. Well, that would be fine. In fact, why don't we just leave it like that? You will have, what, 10 days to respond? Yes, Your Honor. Okay. Is that acceptable to you? Yes, Your Honor. All right. Okay. So with that out of the way, we'll allow the order with time to respond. And then, Mr. Barrett, you may step up and begin your argument. May it please the Court, as I'm sure you are aware, this case arises out of the collapse of the Lancelot Fund. Yes. Before you begin, there was a similar case, a class action, filed in the Chancery Division before Judge Atkins. That's correct. That case was allowed to proceed. There was a motion to dismiss. It was not. Now, is it my understanding that that case has been resolved? That is correct, Your Honor. I believe a couple of months ago, in early August, Judge Atkins approved a class action settlement for $27.5 million. And in that case, they are now going through the process of distributing the settlement. And may I ask you then, were or are the plaintiffs here, were they originally members of that class and specifically opted out? Yes. They were included within the class definition. And were the allegations that your clients made similar to the allegations that were present in that class action? Yes, in general terms. All right. I'm just getting some general basic information. And then all of the defendants here were the main defendants there. I believe that is correct. No. Well, some of them. Some? Are some of the defendants? Yes, certainly. Certainly some of them, yes. Okay. Were accountants in general, some accounting companies, sued in that class action? They were, and they are the parties that settled. All right. And so we have two divergent circuit court decisions. One allowing a similar action to proceed, although a class, and another judge dismissing this action. That's exactly right. Based on some similar allegations involving some of the defendants. Exactly. All right. Certainly based on the same audits of the same fund. Okay. All right. You may proceed. Thank you. As the court understands, the Lancelot Fund collapsed. It had been a feeder fund that funneled investors' money, our clients' money, into the multi-billion dollar Petters Ponzi scheme. Our clients specifically lost about $60 million in net cash. Cash invested less than any redemptions. The net that they had at risk was, at the end of the day, $60 million. So the damages claim would be for that amount plus prejudgment interest, which would be substantial over the length of time that's passed. All we are seeking is what happened in the Tradex case that Your Honor referred to, which is a day in court to get discovery and seek to prove that the defendant auditors failed to perform their most basic task, which in this case turns out to be to detect a blatant fraud, a fraud for which Mr. Bell, the originator of the Lancelot Fund, went to jail himself, and a fraud which legally incapacitated the trustee of the Lancelot Fund. It's the same thing. The trustee stands in the fund's shoes. So what, first of all, both of the judges immediately jumped to Cayman Law. Correct, Your Honor. Now, in your brief, you don't really talk about how you actually get to a choice of law analysis. You just say that under choice of law analysis, Illinois law would apply to all cases. And you take the position that under Cayman Law or Illinois law, you should be allowed to proceed. That's correct, Your Honor. Okay. But before a court does a choice of law analysis, isn't there a requirement before you even talk about choice of law? Wouldn't normally the law where the suit is filed apply? Your Honor, yes. All right. How do you ever get to choice of law? Well, it's the defendants who want to choose Cayman Law because they think it helps them. I think there's one principle under which no choice of law is necessary, and that is the principle that if the law in each jurisdiction produces the same result, then you go with the law of the form. In this case, perhaps a bit odd, but you have each side saying exactly that. The plaintiffs say under Illinois or Cayman Law, we have standing. The defendants say under Illinois or Cayman Law, we don't have standing. So under that principle, there's a dispute between the parties about what the laws say, but in fact that prerequisite that you reach a different result. Well, then let's talk about the judge in your case. He determined that the Internal Affairs Doctrine, which is basically sort of a pre-standing initiative of sorts, that because this involved the internal affairs of the corporation and that under that doctrine only one state or jurisdiction should really have the authority to manage a suit. Correct. And I believe that with respect to the – you get into another – Is this really an Internal Affairs Doctrine? At the end of the day, Your Honor, I don't think it is. I think it's a case between shareholders who relied on the audits to whom the audits were directly addressed and mailed out by the auditors. Communication between the auditors and the shareholders, direct communication. The shareholders had to rely on the audits. When you're dealing with a hedge fund like this, there is no other way that investors have any outside unbiased view of the value of the investment except by looking at those audits. Everybody knows that. You couldn't raise a penny for a hedge fund like this if you didn't have auditors like McLaughlin. What about the – well, before we move to this other issue, your position is that the Internal Affairs Doctrine is not a starting point because that doctrine does not apply where the rights of third parties external to the corporation are at issue. That's correct. And that generally speaking, Internal Affairs Doctrine only applies where the defendants are either current officers, directors, and shareholders. In other words, there's a suit between the shareholders against – That's absolutely the core of the doctrine, something involving corporate governance, internal management of the corporation. Now, your opponents are going to say that it is an Internal Affairs Doctrine. Well, it's – And that's kind of a leap. The reason that I think it is not, again, is because of the existence of the direct claim between these plaintiffs and these defendants based on the audits on which the plaintiffs rely. That – in other words, it is certainly a situation where the company might have its own malpractice claim against the auditors and be entitled to bring that, and that's what the trustee tried to do, and that's what he was prevented from doing. But it is equally possible that you commit a tort that injures more than one person and gives rise to separate and distinct causes of action. And it is our position that the claim of the shareholders directly against the auditors is that separate and distinct cause of action that does not implicate the corporation. Well, this – Excuse me, Your Honor. What we had here was the bankruptcy court proceeded in a logical fashion to say, well, okay, if the shareholders are going to get some money from the auditors indirectly through the company's – the fund's estate making a recovery against the auditors – But they couldn't in this case. Right. But the court said, well, let's – the bankruptcy court said, well, let's find out first if that's going to happen. Right. And then they eventually said, no, it's not going to happen because you're impaired to let go. Exactly. The fund was as bad as the auditors. Exactly. And so at that point – Go ahead. At that point, there is no interference with anything that the corporation, the trustee, might want to do. The trustee has nothing that he can do about the auditors. The shareholders still have that direct claim based on the misconduct directed to them. And so they're pursuing it. So my – But aren't your injuries really the same kinds of damages or loss because of the diminution in the value of the shares? No, Your Honor. I mean, isn't that really kind of what some of the cases say, that when you say, oh, it's because we were misguided by the accountants who tried to tell us everything was fine, so that's why we invested. But at the end of the day, aren't we talking about money damages that really basically the stock tanked and you lost money just like the fund, except for the fund's a little different here? Yeah. Well, a couple of things. First of all, the fund itself, as the Seventh Circuit recognized, is a complete fraud. It's nothing. It's not a legitimate operating corporation. I think this is quite critical. This is not a case where the managers of the corporation screwed up, if you're talking about a hedge fund, where they made a bad investment. This is a Ponzi scheme case. Right. What's the primary case that you would say would suggest that there's an exception for shareholders when you have a Ponzi scheme? I think Anwar against Fairfield Greenwich would be one that I also litigated in the Federal Court of New York. In the Madoff cases? Yes, that was one of the Madoff cases. There are other Madoff cases that say that as well, that refuse to disable the shareholder. I know your position is that under either Illinois law or Cayman Islands law, you would prevail. Your action should go forward. Yes. Okay. So just briefly, how do you explain or tell me how the law of reflective loss is different than basic corporate law in the United States, in Illinois in general? I think that the underlying policies are basically the same. Let the corporation manage its affairs. Certainly when it's an operating corporation, let the corporation deal with its own legal problems and legal claims without interference from shareholders. In that basic sense, it's the same principle. I think that- Well, so under the reflective loss doctrine, is it your position that- in this instance, but isn't it your position that it's one of these exceptions instead? Either way, Your Honor. Either way, I think you get to the same result. Buying the shareholder suit doesn't serve any of the purposes that have been identified for the reflective loss doctrine. I wanted to step back for a moment also. You know, in the United States, the direct derivative claim distinction is quite well established. The principles are pretty clear. It may be unclear in a particular case how they apply. But what about the Coopers-Librand case? I'm sorry? What about the Coopers-Librand case? That doesn't help you at all, and that's an Illinois decision, isn't it? And weren't the shareholders suing accountants there, and the court dismissed it, and then the appellate court, second district or whatever, affirmed the dismissal? How is your case different? Different from Coopers. I'm going to answer that on reply, Your Honor, if you wouldn't mind. All right. I have it at the top of my head. Okay. Okay. Okay. There wasn't a Ponzi scheme in that case, I can tell you that. Yeah. Well, and again, I think that may make a big difference. It was simply a mismanagement case, failure to detect mismanagement. Well, the auditors were sued in that case. Yeah. Yeah. But I will say that the corporation and the shareholders were plaintiffs. The shareholder suits were dismissed, but it did not involve a Ponzi scheme. Right. Actually, Your Honor, in our opening brief, we cite a couple of cases, one from the northern district, one from this court. The northern district case of Zurich against Cogley and Acey specifically allowed a shareholder claim to proceed against an outside professional where the company had an ongoing malpractice suit, recognizing just the kind of distinction that I'm talking about. So I don't think the law is 100% clear in either direction. There's certainly that authority. There's a case called Mann v. Kempner. Yes. In this court, this district, and that case specifically says that an inducement claim, which is what we have here, we were induced to invest by these inaccurate false audit reports, an inducement claim is a direct claim and it can proceed. And I think that's generally the rule under American law. The thing about the reflective loss doctrine is that it sort of comes out of about a dozen or so cases from all over the British, former British Empire, the British Commonwealth, and generally the courts in those jurisdictions look to other courts in other countries when they're addressing the same issues. Well, tell us a little bit about that language that says if the funds can't make good on the claim, then the reflective loss doctrine really doesn't apply. Is that how you understand it? Yes, Your Honor. I mean, this is a little bit, the reflective loss doctrine is meeting these, I'll just call them English cases for shorthand. Johnson is the first one. Johnson is the first one. That's an English case, but there's a bunch of other ones, and we've both said them. This is a little like medieval theology. You can go into the cases and you can pick out language, as Your Honor just did, that's very favorable to us. They can go into the case and pick out language that's very favorable to them. I think you have to look very carefully in the first place at the facts of the cases. And I don't believe, I could be wrong about this, but I don't believe that there is actually a case that is really unforged with this one, where the shareholders are thrown out in a situation where the company was absolutely barred by its own conduct. Right. So are there any cases that your opponents will cite to this Court that will show that these reflective loss doctrines either have considered or in any way reflect a situation involving a Ponzi scheme? Yeah. I don't believe so, Your Honor, and that's part of the problem. So you mean these Ponzi schemes haven't occurred over in Great Britain or anywhere else? They certainly have. They haven't necessarily gotten there. You know, there's a case, the Barings case, which they cite, which comes out of the fraud in Singapore where there was one trader who lost a billion dollars for Barings Bank. And that case has some language that maybe helps them more than it helps us, but it's also distinguishable. That language is clearly dictum. The Court said that the plaintiff didn't, that there was no duty owed to the plaintiff in that case, and so the plaintiff had no claim whether or not it was reflective. And this is the problem with the English cases. Again, it's like medieval theology. Anybody can find language that helps them. The doctrine is still developing, and I do want to call the Court's attention to a case that was decided just last year by the trial court in the Cayman Islands, and there's an extensive opinion, 100- or 200-page opinion by the trial judge. Is it cited in your brief? It is cited by both sides, Your Honor. Both sides cite it. And in that case, what the Cayman court said, and I submit that when the Cayman court says what Cayman law is, that is the most relevant for our purposes here because that's what we're trying to decide. We're not trying to decide some amorphous commonwealth common law, sort of like federal common law before Erie. We're deciding what's the law of the Cayman Islands. So we have a recent Cayman case which says, in comparable factual circumstances, which says that the, you have to look, you really have to look at the merits of the case, of the company's case, and see whether that's a good case or not. And the defendants cite the case because, ultimately, when the court undertakes that detailed analysis of the merits, it finds that the trustee, liquidator, whoever it is, is pursuing litigation in other jurisdictions. I think it's in Luxembourg. That looks like it's a pretty good case. It's going forward. It seems to be a strong case. And so he says, well, okay, under this merits test, the defendants have shown that the issue is being litigated and is being litigated with some significant likelihood of success by the company, by the trustee. But that's only on the facts of that case after doing an extensive analysis of the other pending litigation. Here we have exactly the opposite situation. When we look at the merits, as the Premio case says we do, when we look at the merits of the action that the trustee brought, we know the answer. The answer is you didn't have a claim in the first place because you committed a fraud yourself. And so I submit that under that authority, which is directly on point here from the most relevant theory. So then couldn't you also argue that under this reflective loss doctrine, maybe that's what Judge Atkins was getting at, that there really was no, that the reflective loss doctrine doesn't really apply because you have a fund that can't ever really deliver? Yeah. I think that's exactly right, Your Honor. And again, it's a little bit like theology. Does it mean not delivering? Does it mean they're going to lose? How do you interpret the language, which is kind of all over the place in a particular factual context? Let me ask you this. You're speaking on another vein. How do you claim that there's a successor liability claim here in the manner in which you pleaded guilty? Well, I don't want to pre-permit my colleague's argument, but I think with respect to the fund or the firm, ours said what came in. It's very clear, Your Honor. There are two equitable exceptions to successor non-liability. One is where the succession was a de facto merger and the second is where the purchaser is merely a continuation of the seller. Here, what the record shows is, among other things, the firm itself, when it announced the transaction, the merger, it said R.S.M. Cayman announced the formation of the new firm, the one we're suing, trading as R.S.M. Cayman and the successor firm to M&T Cayman, which was the original audit firm that signed the letter. So they themselves called themselves successors, one of the elements. But how did you plead? Where did you plead? Let's see. We have some in the pleadings that the firm will continue to operate from the current premises with the same staff, facilitates access, and that's in paragraph 45 of the complaint. Although, Your Honor, I would say that Was this the defendant over in the federal suit? I'm not certain. You're not certain? Okay. But, Your Honor, another issue here is that the circuit court did not reach the issue of successor liability. No, but we can affirm on any basis. Absolutely, Your Honor. On the other hand, if it's really the kind of pleading problem that Judge Gordon is suggesting, Then you should be allowed to amend it. We should be allowed to amend it. It's a classic case for why this court should not dismiss because it is clearly just a pleading problem. I mean, I'm reading from their own press releases and websites. If they're not in the complaint, we'll put them in the complaint and I think they're dispositive. Unless the court has any other questions, I'll reserve time for rebuttal. All right. Thank you. We'll give you time for rebuttal. Jerry? Thank you. May I please have the court? There are really only two things this court needs to do to affirm the judgment dismissing the case. The first is adhere to the unbroken line of Illinois authority saying that the question of whether shareholders have standing is governed by the law of the placement corporation. Illinois courts have done that. But what about the interest that Illinois has in this litigation  Because under general principles choice of law, we don't even do that if there's not a conflict. That's right. What is the conflict? There would only be a conflict if you decided the claims could proceed with the shareholders under Illinois law and then we need to look to see whether or not Cayman Law was different. We think the results require dismissal under both of them, but they are different tests. So it would be a different analysis you use under either situation. And that's the question of what about Illinois' interest in this. Illinois addresses choice of law on an issue-by-issue basis. That's also how Restatement Section 302 says the Internal Affairs Doctrine is applied. You ask with respect to this particular issue, here is it the claims of a Cayman Island corporation or the claims of its all non-Illinois, non-U.S. foreign shareholders. Okay, let me ask you this. That's the question. Let's jump to your position. You also argue, like your opponent, that under either Illinois law or Cayman law, the court properly dismissed under 2619. That's correct. And the trial court used this reflective law, loss doctrine. Correct. And what case would you cite that says that all of these cases apply, even in the situation of a Ponzi scheme? Sure. Cases where the Internal Affairs Doctrine has been applied in the Ponzi scheme. All right. We're going to start with the Internal Affairs Doctrine. Let's look at what that doctrine means. Yes. Okay? And everything I've read indicates to me that the doctrine, although very potent, has specific applications. And it doesn't have application where shareholders are suing accountants. That's incorrect, Your Honor. There are a number of cases around the country, including one cited by the plaintiffs, where the Internal Affairs Doctrine is used in exactly these circumstances. Some of them are arising out of the Madoff Ponzi scheme. All right. It's the Oskanazi case versus Tremont out of Massachusetts. Okay. So what about this new Greenwich case, the trustee versus the CITCO fund? Yes. Because although PWC's role as an auditor relates to the internal affairs of the corporation, PWC was still a contractual agent employed by AIG to carry out certain contractual duties rather than a part of AIG. Illinois Internal Affairs Doctrine does not apply where the rights of third parties external to the corporation are at issue. Contracts and torts. Excuse me. So I'm not sure how what you're saying meshes. Well, I believe that's coming from the Anwar decision. That's correct? No. That was the new Greenwich litigation. Okay. I believe it's applying New York law. And New York expressly says in the Anwar decision that they don't follow Restatement 302. They take a more flexible approach. True. And there are numerous cases where the Internal Affairs Doctrine have been applied to claims by shareholders against auditors. In Stevenson versus CITCO. What about Illinois? Sure. In Illinois, every case in which shareholder standing has been addressed has followed the law of the place of incorporation. There is no Illinois case where a court has decided that the Internal Affairs Doctrine doesn't apply because it's a suit against a third party. And there are Illinois cases where the Internal Affairs Doctrine has been applied in cases brought by former shareholders against former officers. That's in the Seinfeld versus Bayes case, I believe, as well as the Fifth Circuit's case applying Illinois law in Smith versus Waste Management. Now let me ask you this. Was your client a defendant in the Trade Act suit? Yes. And that suit, your client is actually settled in that suit, correct? That's correct. And Judge Atkins concluded that the Cayman Islands law did not suggest a dismissal of these same claims. That's correct. The opposite view of Judge Mitchell. Right. Right. So we have two different judges in the same division, one saying the action should go forward, it did go forward, and now it's all been resolved. And then we have the plaintiffs in this case who opted out, who essentially made the same claims in this suit. And another judge said, well, he immediately jumped to Cayman law, and then he said the Reflective Loss Doctrine does not allow for this. Now, what are the two exceptions to the Reflective Loss Doctrine? So the Reflective Loss Doctrine, typically the exception that is applied to the Reflective Loss Doctrine is the Giles v. Ride exception, which is when wrongdoing by a party deprives the company of their cause of action. That party cannot invoke their wrongdoing, which robbed them of the defense. Okay. Now, just go back for a second if you would, Mr. Terry. Sure. So in this case, what we have is a wrongdoer to start. Is there any question about that, that the fund was a wrongdoer? Hasn't the Bankruptcy Court and the Court of Appeals, haven't they all said the fund was a wrongdoer? Yes. Are we kind of bound by that or not? In this case? Sure, they allege that he was a wrongdoer, but let me make clear. The first principle you announced related to a fund or a corporate party that wasn't a wrongdoer. The Giles v. Ride exception says that if a party is the wrongdoer, that party cannot invoke the Reflective Loss Doctrine. All right. So why would that doctrine then apply here? Because you have a wrongdoer. Sure. For exactly the same reason, it applied in the Barings case, and in the Promeo case, and in the Kinggate case. Because we are not the party who caused the company to lose its cause of action through impaired ellipto. We are not the wrongdoer who is impaired ellipto, deprived of the claims. This is exactly like the Barings case. But isn't the fund impaired ellipto with your clients? No, not with our clients. The fund is. The fund is. The fund is impaired ellipto with whom? The fund is impaired ellipto compared to our conduct because our conduct was found to not rise to the level, even as alleged, of that of the fund. Why couldn't the trustee go forward with the suit in federal bankruptcy court? Because it was barred by the impaired ellipto doctrine. Okay. Don't you have to be impaired ellipto with another party? It just means that their wrongdoing is greater than ours. Well, doesn't it mean that where there's two wrongdoers, the law is not going to get themselves, it won't get involved? Sure, we were the alleged wrongdoer. But it's not our wrongdoing, our alleged wrongdoing, that deprived the fund of its defense. You're citing these cases, but explain to me how the reflective loss doctrine applies to this case. Sure. It applies for two reasons. The general rule set out in Johnson v. Gore and Wood is if the company had brought a suit to enforce and succeeded, and that successful suit would fully recompense the plaintiffs, then it falls within the reflective loss doctrine. Okay. Regardless of whether it was never brought. But see, how can you say that applies here when you have a Ponzi scheme at play? For three reasons. Okay. First of all, the Barron's case. The Barron's case is on all fours. It is a suit against an audit firm by shareholders. Originally, a suit was brought by the company against the auditors, and that was barred. It was barred by the doctrine of deceit because the company had lied to the shareholders. So the company lost its claim. So similarly to the Imperial delicto. Correct. Very similar. The company lost its claim due to its own wrongdoing. And the shareholders said, we should have a claim now because the company doesn't. Now is that a Cayman Law case? That is a case decided under English law. Okay. Which is the fountain. And let me get to one point which Mr. Barrett raised, which is the suggestion that somehow Cayman Law is like a theological exercise. And it's difficult to do. He was in the seminary in his youth. I don't know. So this court has actually made clear how you determine foreign law. Foreign law is always difficult for us to determine because we're not foreign lawyers. Yes. That's why the Illinois Court of Appeals has said it has to be decided on the affidavits. It's decided like a question of fact. We don't take judicial notice of the cases he and I come up with. You take a look at the affidavits. That is the record. And I would submit it. We don't take judicial notice of foreign law. Thank you. And if you take a look at the affidavits, there's no dispute as to what Cayman Law is. Does their expert dispute the notion that even if the company's claim is barred by a complete defense, the reflective loss doctrine applies? No. Could you summarize for me then, obviously you think Judge Atkins had it all wrong, right? Correct. Okay. So explain to me how he got to his position and let it go forward. Well, there's one thing that he got right, that this has to be decided under Cayman Law. Everybody agrees on that. You say that you win either way. You win under Illinois law, you win under Cayman Law. And they say exactly the opposite, that they win under it. So tell me about what was his analysis and why is it flawed? His analysis is flawed because he assumed that the existence of the defense against the company would somehow take the shareholders' claims out of the reflective loss doctrine. That is directly contrary to the relevant precedent. It's directly contrary to the Barron's holding. It's directly contrary to the language in Day and Cook. There is not a single case. It wasn't Barron's or Ponzi? Ponzi scheme case? It wasn't a Ponzi scheme. But Ponzi scheme cases include the Kinggate case and also Promeo. Two cases where the reflective loss doctrine is applied to bar shareholder losses. And the Promeo, is that the, what country did that originate out of? That's a Cayman Islands case. Okay. No, I know it's a Cayman Islands case, but I thought there was a fraud allegation and it arose in a different country, but they applied. It was under Cayman Law and decided by a Cayman court. All right. So the reflective loss doctrine is applied in Ponzi scheme cases. There's no case reported from either an English court or a Cayman court or any other court applying the laws of England where a successful defense by a company has relieved the plaintiffs of the reflective loss doctrine. It's never happened. Why did the Federal Bankruptcy Court, the Seventh Circuit Appellate Court, really say, though, that it's time for the shareholders to have their day in court against the accountants? Because those claims were all stayed. Right. But, no, I mean, isn't that, though, a suggestion that they had actual claims that should be pursued? And that's actually what happened in the Tradex case. So the Seventh Circuit does not have before it any question of standing whatsoever. No, that's true. That's true. The only question is whether the imperative elective doctrine applies. And Judge Easterbrook was observing the imperative elective doctrine would bar the trustee, but it doesn't necessarily bar the plaintiffs. Okay. What about the reflective loss doctrine and the language I spoke of earlier that says where the funds, so to speak, can't make good on the loss? What does that mean? The distinction is drawn in Day v. Cook and also the Barings case between where a company never had a claim and a case where the company had a claim but it lost subject to a defense. So what the courts look at are, is the company a party that would actually have standing to assert this claim? And it doesn't matter what you're saying is under Cayman Law. It really doesn't matter what the defense is. That's precisely right. In the Barings case, just like here, a successful defense was asserted. In Day v. Cook and Barings, both cases the court said it doesn't matter that there's a successful defense. And that's consistent with the rule in Johnson v. Gorin-Woods, which says the reflective loss doctrine applies even if the company fails to make good on that loss. So when would those exceptions ever apply? So the Giles v. Wright exception says that if we, through our own misconduct, somehow deprived the company of its cause of action, we couldn't then say, well, only the company can bring the cause of action forward. So what about when you deprive the shareholders who invested based on representations that you made? You're just saying that there's nothing for you. You're out. So that's exactly the same. That's the judgment that Cayman Law sets, and it's exactly the same as in the Barings case. In Barings case, they said we lost all this money because of auditor negligence. But they were still barred. Because of the defense of what? Because of the defense of deceit, because the company had lied to the auditors. The same thing in the Promeo case. The Promeo case is a Ponzi scheme. It was claims involving, I believe, claims against audit firms. Those claims were barred under the reflective loss doctrine. Okay. Now, just in summary then, tell me how Atkins got it all wrong, even though you settled. Well, whether we settled has nothing to do with whether Atkins got it wrong. I know, but you did settle, right? He got it wrong. And it went through whatever. He did not allow the dismissal. He did not allow the dismissal. He got it wrong because he ignored the Cayman principle that even where there is a complete defense to the claim, the reflective loss doctrine applies. All right. Okay. So that is why he erred on Cayman Law. We think he also erred under Illinois law because under the Zorki-H test, the question for whether our shareholders have standing is whether or not they have losses that are not in common. Who were they suing, though, in that case? Essentially the same parties. Accountants? Oh, in Zorki-H? I'm sorry. I thought you were talking about me. No, in Zorki-H, they were suing not accountants, but I believe it was an inter-corporate battle. Right, right. So it's a little different, isn't it? Well, the case that's the closest, then, is the Cashman case. Zorki-H sets the test. Cashman is the closest, which is the Cooperson Library case. No, Cashman is a little different, too, because in that case, the plaintiffs were not only the shareholders, but they were the corporate directors. And there was no policy scheme at all in that case, none, none whatsoever. And you had plaintiffs who were not only the corporate structure companies, but you had individual shareholders. So that case really isn't similar at all to this. I don't think it is. It's a case involving others. It is. It's certainly more similar than the Mann case because in the Mann case, the shareholders did have losses that were entirely distinct from the company. Here, there is not a single loss that they have that, A, wouldn't have been recompensed if the company had succeeded in its claims against us or Greg Bell or the management company, and, B, there's no loss that they have that's not in common with every other shareholder who is holding shares as a company. But is it about whether their claims are the same as every other shareholder, or is it really about that the loss is the same as the corporation? Depends on the test. That's why there's a difference. Under the Cayman Reflective Loss Doctrine, the question is, had the company succeeded, would it fully recompense them? If a successful suit would have recompensed them, as it clearly would have, it's barred by the Reflective Loss Doctrine. But in this case, there was no suit that could ever recompense them. That's not true, Your Honor. Had the trustee prevailed in its claims against us or against Greg Bell. Right, but it couldn't prevail because it was in peri delicto. It could have prevailed against Greg Bell. It wasn't in peri delicto with Greg Bell. He couldn't invoke that defense against them. Is Greg Bell an individual defendant here? Not in this case. But it was a claim that the company could have asserted for these same losses. I mean, I don't know how you can mix Bell with a corporation. Because the question is whether or not they could have brought a claim that would have fully recompensed the plaintiffs for these same losses. And they had a number of claims that could have done that. And, Your Honor, Cayman Law is quite clear that the fact that they lost on the defense is irrelevant. I would urge you in determining what Cayman Law is. I think I understand your position. You're basically saying that under Cayman Law, that it does envision a Ponzi scheme. It does envision that if there's a defense, regardless of what type it is, that they're out of the box. That's precisely what happened in the Barron case. Yeah, and the Premio, you said as well. The Premio as well, and the Kinggate case as well. Yes, all right. So there are a number of cases where that's been applied. We also think that under Illinois law, the same result would pertain because their losses are in common with the other shareholders. And as the court, I believe it was the 2nd District in Nethery, said that whether or not it's framed as a fraudulent inducement claim or having lost money after they invested. How would you ever – I mean, is there ever then a situation where one could adequately plead that losses due to being told this is a great company to invest in, everything is clean, there's a whistle, you can invest, we're giving our imprimatur? Okay. How could a shareholder – or maybe you're going to tell me a shareholder could never say that my losses are that I invested, number one, based on representations that were made that were false, and two, I continue to invest because the reports kept coming back clean, so that a shareholder could never ever really complain because the company has the same kinds of losses. But in this case, the company was taking in all that money to its own benefit. Sure. The typical remedy for that would be to bring a derivative claim. Right, but we – that's what I'm saying. I'm asking you – you're saying there is no such thing that a shareholder could never ever claim that they invested based on fraudulent or negligently or reckless advice of the auditors because those losses will always be a diminution in their shares. They're not really their own individual losses based on investment advice. So that's not a position. And there are certainly cases where investors would have losses that were their own losses set aside for the company. Okay, but what would that be? Those losses would be losses they incurred in making that investment in the first place. Well, isn't that what they plead in their complaint? No, they're only – Isn't that what Judge Atkins said they plead? Their only quantum of damages is the loss of $79 million. That's what they say in every prayer for relief, which is the difference between the reported net asset value of their shares in September of 2008 and what they say they're worth now, which is essentially nothing. And you're saying there's nothing in the complaint, what is it, 73 pages, nothing in there that talks about investing and continuing to invest? I mean, aren't you really talking about a pleading defect when you say that the amount of the damages is equal to the net losses? Well, they plead it like that because that's actually their theory is that they lost their proportionate share. But there's no reference to any damages other than we lost all our money when we invested. That type of damage is reflective. That type of damage is the same as that. But don't they plead in their complaint that they invested initially based on clean audits and that they continue to invest based on clean audits so that initially their losses are based upon this investment they made based on fraudulent or reckless or negligent misrepresentations? So, Your Honor, that's actually the way they describe it in their appellate papers is contrary, directly contrary to how they describe it in their complaint. Okay, but isn't that a pleading defect? No, it's not a defect. How would we decide that as a matter of law right now when they have all these other allegations in the complaint about their initial investments? I mean, I'm just saying these are in the complaint. So, Your Honor, they plead that up until September 2008, investors were able to be fully redeemed. So up until the time of the collapse, investors were able to take out their money in full, which means, of course, their money didn't disappear when they invested in the fund. Is it correct, Mr. Carey, that some of these investors actually were aware of the Ponzi scheme and then they bought into it? Don't you say something like that? Well, I think what we say is that these plaintiffs, these shareholders, are actually people who, for the most part, aren't actually shareholders who were in the fund at the time. They're litigation finance shops who purchased these shares in the hopes of... But knowing full well that the scheme had already been disclosed. Correct, and that the shares had lost all their value and the only remaining asset was the litigation. Okay, all right. So that's what we're saying. The important point, though, for their loss is that they did not lose their money when it went into the company. They lost it when the Ponzi scheme was revealed. And that's clear by their own allegations and it's exactly the same analysis that the court applied in Kinggate. It rejected that very argument that there was a loss in inducement. The loss happens when the Ponzi scheme is revealed and all of a sudden there's not enough money to cover all the claims. Thank you, Your Honor. You're welcome. Wait, I have one question. Sure. I guess it's your argument that Atkins' decision has no bearing on this case whatsoever. Well, you have two contrary circuit board opinions and I suppose it's up to you to decide which one's right. Well, is his decision the law of the case statute? Would that apply here? No, I don't believe so since I specifically opted out of that class. Okay, thank you. Any further? All right. Mr. Krause, good morning. Thank you, Your Honor. I represent Kamin, RSM Kamin Limited, and the only issue really here is the issue raised by Justice Gordon, the successor liability issue. That should be decided under Kamin Island's law. The reason is that distinguished from the standing issue where you've got the plaintiffs and the defendants, those are the parties of interest and you can argue about whether Illinois or Kamin law applies. Here, we're talking about successor liability. One Kamin Island's entity, does it assume the liabilities of its alleged predecessor, another Kamin Island's law company? Obviously, Kamin Island has the greatest interest in deciding that issue as opposed to Illinois. We're talking about one entity versus another in the Kamin Islands. The only argument that the plaintiffs make about why Illinois law applies to this successor liability issue is based on an engagement letter from the old entity, M&P Kamin, with the plaintiffs, and there was a choice of law provision that said Illinois law applies, but that's the cart before the horse. That's the old entity. The old entity allegedly bound itself to Illinois law, but that's not our question. The question is, does the new entity have liability based on the old entity's, who owns the companies when they're reconstituted? So you can't go back to the old entity and then have an agreement they signed to be dispositive on the choice of law. Were you in the Tradex case? No, we were not. All right, so you're completely, you were never a defendant. Never a defendant. Our alleged predecessor was, but not us. So if you decide that Kamin Islands law as the entity of jurisdiction with the most compelling interest in the successor liability issue applies, then you look at the only law that's before you in the record, which is our affidavit of Mr. Galatopoulos, the Kamin Islands law expert, who says there is no successor liability. There is no mere continuation or de facto merger. There's none of that. All there is is if there's an explicit agreement, which the plaintiffs are not alleging and I don't believe could allege, from the new entity to assume the liabilities of the old. So that's the legal argument under which this court can affirm on an alternative ground and dismiss their claim with prejudice. They don't need to go back to the lower court to replead because there's nothing to replead because there is no successor liability under Kamin Islands law and all the arguments about whether the press release of RSM Kamin, which uses the word successor, is somehow dispositive, and by the way, even under Illinois it would not be, of who owns the entities is beside the point. Well, there is successor liability under Illinois law. It's just that your position is that this case does not fit into that at all. That's right. There's a difference, to get to your earlier point, Justice McBride, between Illinois and Kamin Islands law in successor liability. So it does matter, and if Kamin Islands law applies, there's no successor liability, and you're right. Under Illinois law, if that applies, then we say they haven't pled it correctly and probably they get a chance to replead below, although I would point out that saying you're the successor doesn't even come close to hitting the elements of successor liability, which would be primarily who owned the old entity and who owned the new entity. That's not even the dispute in the briefs, and they haven't pled anything about who owned the entity, but again, that's probably a pleading issue. Well, isn't there a statement somewhere in there that your company is the successor? There's a statement in a press release by RSN Kamin Limited that it's the successor to M&P Kamin, yes. Well, isn't that an admission? It's an admission, but it's an admission that doesn't go to the elements of the successor liability under Illinois law, which is primarily under the workforce case. Who owns the new entity and how does that compare? And what workforce says is the old entity's owner must retain a controlling interest in the new entity. Saying you're the successor says nothing about that, so it's not dispositive. You can call it an admission, but it's an admission that doesn't matter because... Does it raise any question of material theft? I think that's probably... You're really making a point. Yeah, it's probably because they get to replead under Illinois law, so it doesn't matter, but they don't get to replead because it's an issue of law under Kamin Island's law, and the only law before you is the Gallatopolis affidavit. So I think it's pretty straightforward that under Kamin Island's law, which applies, there's no liability. Thank you. Thank you. Mr. Barrett. Thank you, Your Honor. Just a couple of points. On the last point, there are several different grounds for successor liability, not just the one that he's referring to. The same employees, the same offices, the same business, all carried on by the same people. If that's not a successor... And where was this carried on? In the same offices in the Kamin Islands. And, you know, if there's an issue about Kamin law, it's an issue of fact under this Court's jurisprudence, and it's not clear to me why... Well, under Kamin law, according to Mr. Krauss, there is no such thing as successor liability, so how do you prevail and how do you get to replead? It seems like there is a conflict as far as this particular defendant so that the Court could reach the question of whether Kamin law or Illinois law applies. And if Kamin law were to apply and there's no such thing as successor liability, how do you get to replead? It's a question of fact, and we should have the opportunity... Because of what? Because of the... Because of the question of what Kamin law is, is a question of fact. Apparently, that was not... He says that under Kamin law, there's no such principle as successor liability. No, no, I understand that, Your Honor. Okay. But what he's also saying is we didn't put in anything to contest that fact. But when we're talking about facts on a motion to dismiss, we should have the opportunity to contest that fact, just like any other fact that's in dispute. Turning to the main part of the case, Your Honor, I think, Justice McBride, you hit the nail on the head in one of your questions. What the defendants are arguing for here is, and I understand why they want to argue it, is that there is an absolute rule that auditors are completely immune from suit, from liability, if they fail to discover a fraud. And the reason that I say that is... And discovering a fraud is one of the principal reasons, obviously, why you have an auditor. Now, maybe we can prove that they didn't perform their duties properly in not discovering it. Maybe we can't. That's a question for the merits. But discovering a fraud is a principal thing that we have auditors for. And what they're saying is if it's really bad at the company, if the guy's a complete crook and a liar, as he was here, not just negligent, didn't just make bad investments, a complete crook, then the company's going to be barred by impartial delicto under U.S. law and apparently under foreign law. And then when the shareholders turn around and say, well, you know... Well, the way I understood what Mr. Terry was saying was that if the fund had... if after this suit where the fund can't recover because of its own deceit or fraud or Ponzi scheme or what have you, that that's like an absolute defense. Right. And that you're out of the box. And then they're out of conflict because... Under Cayman law, because the counsel argued that under Cayman law, the reflective loss doctrine does take this principle into account. Well, he said that. I mean, but I don't think there's anything in any of the cases which suggests that auditor... they really are saying, Judge, that auditors are subject to absolute immunity if they... Even if there's a Ponzi scheme. ...fail to discover a Ponzi scheme. Right. Well, what's the difference between a Ponzi scheme or the case that he cited that involved deceit? I mean, I think he's saying it's the same, essentially the same doctrine. Yeah. I mean, in that particular case, in that particular case, the deceit, the alleged deceit was that the company itself deceived the auditors. So that is a different distinction from what we have here. But in addition, in the Barings case, as I said before... That's their big case. That's their big case. That's their big case. It's not, you know, it's a case coming out of Singapore. Oh, Singapore. That's what it was. It was, as I said, the discussion was victim because the court actually held that the auditors owed no duty to the plaintiffs in the first place. It also was addressing it in the context of offsetting claims rather than affirmative recovery. And it pointed out that if the company got an offset against the claims that the auditor was making against it, and then the plaintiffs were allowed to sue, that would be true double recovery for this exact same wrong. And that is one of the things we're trying to avoid by the reflective loss rule. Again, we don't have that problem here because the company has no claim, whether it's an offset or affirmative claim or anything else, has no claim under their theory. With respect to the restatement section 302, which counsel raised, what's important there is that as they acknowledge on page 19 of their brief, the internal affairs doctrine doesn't apply where another state has a more significant relationship to the occurrence and to the parties. And that's exactly what we have here. I won't go through all the interests that Illinois has. Yes, you've set them out in your brief. I think that is very clear. Now, what they say is, well, those interests only relate to the substantive tort claim. Right, not the procedural standing issue. Exactly. But, Your Honor, it seems very clear that those same Illinois interests relate to the standing question for precisely the reason because if no one has standing, and that's exactly what they're saying, nobody has standing. Guess what? Nobody has standing to sue us. If nobody has standing, then the substantive interests are meaningless. In other words, these auditors practiced in Illinois. The fund has standing, right? I'm sorry? Didn't the fund have standing except that they were in peri-delicto? Except that they were in peri-delicto. But that's just one step earlier. They're in peri-delicto.  We're talking about do the shareholders have standing, and we're talking about does Illinois have a more significant relationship to the standing question, according to them, than the Cayman Islands? And I would say the answer is clearly yes because Illinois, as a matter of public policy, shouldn't leave shareholders completely without remedy, shouldn't completely immunize allegedly serious misfeasance by the auditors under the guise of no standing. And, you know, in addition, we cited some cases on page 11 of our reply, including the Seventh Circuit, which say that under the peri-delicto claim, the claim does not exist. It's not a claim. It's not a question of just a defense. You know, we acted in good faith. The claim doesn't exist in the first place. So the company had no claim. And this goes to the point where counsel said you're trying to recover the same loss. That is wrong, Your Honor. I think you correctly pointed out to the extent this $75.9 million number based on the net asset value that was lost, that's at most is a pleading deficiency. Toward the end of the complaint, it very clearly sets out the theory of loss, that they made investments based on the false audit reports and they lost those investments. All right. You're going to have to sum it up, Mr. Berry.  Well, thank you, Your Honor. Your Honor, I think what I want to leave you with is that I think it would not be appropriate for the court to adopt a rule that effectively immunizes auditors in the worst category of cases, where the underlying conduct that is of the fund managers is the worst. That's where we immunize the auditors from recovering any claims against them. All right. Thank you very much. I want to thank the lawyers, each of you, Mr. Barrett, Mr. Terry, Mr. Krauss, and co-counsel. The case was well argued and well briefed. We will take it under advisement. So thank you. Thank you.